Trimble and Wife v. James, Ad'r.

## TRIMBLE AND WIFE VS. JAMES, AD'R.

| 40 | 393 |
|----|-----|
| 55 | 224 |
| 40 | 393 |
| 60 | 477 |
| 40 | 393 |
| 65 | 549 |
| 40 | 393 |
| 67 | 346 |
| 67 | 347 |
| 40 | 393 |
| 68 | 542 |
| 40 | 393 |
| 75 | 188 |
| 77 | 355 |

1. ADMINISTRATION. *Proceedings of Probate Court, how corrected.*

An order of the Probate Court confirming an Administrator's settlement has the force of a judgment, and if erroneous can be corrected only by appeal. But Chancery may interfere to correct fraud or relieve against accident, or upon some other ground of acknowledged equity jurisdiction, to prevent irremediable mischief; such interference to extend only so far as to effect the object.

2. SAME: *Administrator or his attorney cannot speculate on the estate.*

It is an inflexible rule of equity that all profits made by a trustee must enure to the *cestui que trust;* and if an administrator or his attorney buy up claims against the estate at a discount the profit enures to the heir, although the purchase be made by borrowing money at ruinous rates of interest and the sale of his own property, and the estate be thereby saved from insolvency.

3. SAME: *Widow-administratrix and her successor's liability for rents. Rights to personalty.*

A widow administratrix holds the mansion and farm attached as widow, free of rent, until her dower is assigned by the heir or his guardian; and a subsequent husband who succeeds her in the administration holds by the same right and is not liable for rents during her life and occupancy until the assignment of dower. For other lands they are liable for two-thirds of the rent, the other third being hers as dower. As to the personal property, she is entitled to one-third, which becomes her husband's upon her marriage, and he is not chargeable for it as administrator.

4. SAME: *Administrator entitled to interest on advances.*

An administrator is entitled to his advances for the estate and six per cent interest, but without rests. It must not be compounded.

5. SAME: *Fraud of administrator: Relief.*

Although an administrator's credits may be fraudulent in law, yet if there be no actual fraud there is no relief in equity unless there has been injury also.

6. SAME: *Correcting administrator's settlements in equity.*

When chancery undertakes to correct an administrator's settlement it will relieve him of improper charges made against him-

self as well as charge him with omitted liabilities, and correct improper credits.

7. CHANCERY  PRACTICE: *When cross-bill not necessary.*

When a defendant seeks no positive relief against a plain'iff, but only to annul the equities he claims, or to modify the relief, seeking nothing but the dismissal of the bill, a cross-bill is not necessary; it may be done by way of defense.

APPEAL from *Jefferson* Circuit Court in Chancery.

Hon. X. J. PINDALL Circuit Judge.

*Jones & Hemingway* for Appellants.

The Court had jurisdiction. 20 *Ark* , 526; 30 *Ark.*, —; 67 *Mo.*, 247; 54 *Mo.*, 2u1.

1. James should have been charged with the *whole* of the personalty and of both notes. No dower was ever assigned to Mrs. D., nor did she assert any right to such during her life. On her death, if the right survived, it passed to her legal representatives, &c.
*Acts* 1859, *p.* 299; *Bish. Mar. Wom.,* 1 *Vol., sec.* 350, 352; *Tyler on Inf. and Cov.,* 418.

2. Mrs. D. waived her *quarantine* and cultivated the plantation for the benefit of the estate, and James should be charged with full rents of the Hardwick place.

3. Neither a trustee, administrator or attorney can buy claims at a discount and charge them up at their face value. 2 *Caines Cases,* 183; 4 *How. U. S.,* 553; 1 *Johns., Ch'y.,* 36-7; 58 *Mo.,* 593; 43 *Ib.,* 163; 10 *Mo., Ct. Ap.,* 557; *Hill v. Frazier,* 22 *Penn.,* (10 *Harris*) 327; *Perry on Trusts,* 200-207; *Lewin on Trusts,* 318; 4 *John. Ch'y. R.,* 120; 27 *Ark.,* 642; 33 *Ark.,* 586-7; 8 *Watts,* 81.

4. No cross-relief was prayed below and none can be granted here, under the pleadings. The account should be purged of all over-charges and James charged with. the additional rent on both places, and the amount of the inventory and the Wilkins note,

Trimble and Wife v. James. Ad'r.

*U. M. & G. B. Rose*, also for appellants.

If an administrator buys claims against an estate, he holds same as a trustee, and it is *a fraud* to charge more than he actually paid out. 7 *Dana*, 45; 2 *Mylue & Craig*, 361; 4 *Moak, Eng. R.*, 753; *Wharton on Agency, sec.* 231.

James was not entitled to interest on amount expended in buying up claims; *Billingslea v. Henry*, 20 *Md.* 282.

An administrator engaged in a systematic design of defrauding an estate, and it being shown that many of his claims are fraudulent, his whole account is *tainted*, and he ought not to be allowed to recover, even on those demands against which there is no positive proof. *Ringgold v. Stone*, 20 *Ark.*, 527.

*Martin & Martin, M. L. Bell, Martin & Taylor and W. S. McCain*, for appellees.

1.   The widow was entitled to one-third of the inventory, including Dorris' note, *Acts* 1866, *p.* 277; 18 *Ark.*, 422; 5 *Ark.*, 608; 8 *Ark.*, 9.

2.   The place was worked under orders of Probate Court, and even Mrs. D. was not chargeable with rent. *Gould's Digest, Sec.* 70; *p.* 116; *Acts* 1866, *p.* 27.

3.   The widow was entitled to the mansion and farm attached *free of rent*, until dower as-igned. *Gantt's Digest, Sec.* 2227; 34 *Ark.*, 71; 22 *Ib.* 196; 9 *Gratt*, 244; 4 *Dev. & Bat. (N. C.)* 448; 1 *Selden*, 396; 16 *Ala.*, 152; 14 *Ala.* 289; 6 *Monroe*, 562; 7 *Ib.* 333; *Ib.* 640; 5 *Dana*, 37; 3 *J. J. Marsh*, 48; 20 *Ala.* 662; 9 *B. Mon.* 579; 18 *Ala.* 600.

4.   James had the right to buy claims against the estate; he used his own money; he was under no obligation to purchase for the estate. He did not deal with *property that belonged to the estate.* He did not buy as attorney for the administratrix, and take title in himself, and thereby become a trustee *ex maleficio.* The demands were *bona fide*, and his purchase could not augment.its

liabilities. "There can be no fraud without some injury," &c , &c.

5. The estate was liable for the "Nancy Henderick, executive" note. Dorris was an *heir to whom assets had descended*. *Sec.* 153, *Gantt's Digest*; 31 *Ark.*, 234.

6. An administrator is entitled to interest upon sums advanced by him. *Gantt's Digest*, 92; 53 *Vt.* 118; *Williams on Executors, p.* 1686; 6 *Halst.* 47; 10 *Peck.* 102; *Redfield on Wills, part* 2, 213.

7. Courts of Chancery will not set aside settlements for mere irregularities. They should be corrected by appeal: 33 *Ark* 732; 36 *Ark.*, 390; 5 *Gray*, 405; 8 *Mass.*, 162; 26 *Conn.* 184.

EAKIN, J. In this case it is most convenient to make such statements of the facts, pleadings and proceedings as may be necessary to explain the points as they rise. To this end a succinct history, embracing matters not controverted will be useful.

In January, 1867, Garland H. Dorris died intestate, leaving a widow and three small children, two of whom died soon after, whereby the complainant, Maggie E., who was the survivor, became the sole heir to all his estate, and entitled to all the personalty, saving the rights of the widow and creditors. No question is made in this case of any rights claimed through the mother as such.

He left a large plantation in Jefferson county, including the residence, which for convenience, we will designate as the *Hardwick* place; and a smaller, but still valuable plantation called the *Greenfield* place, which had come to him by inheritance from Nancy Hardwick, who had herself died leaving a debt unpaid.

On the 28th of January, 1867, his widow was made administratrix, and thenceforth acted under the advice of

defendant's intestate, Thos. S. James, an attorney at law. On the 22nd of May she filed an inventory and appraisement of the personal property, footed up with the amount of $8,245, which was an error in calculation, the true amount being $8020. The choses in action reported were two notes of Wilkins & Bro., April 20, 1866, for $1000, and one of Thomas Dorris, Feb. 18, 1867, for $3,391.

At the October term, 1867, she asked and obtained permission of the Probate Court to ship the cotton crop of 1867 to Moses Greenwood & Son, of New Orleans; and in January, 1868, obtained an order to keep the property together for the benefit of the estate during the year 1868, and was ordered to render her account of the profits at the January term, 1869.

Before that time, and without ever having made any settlement, she intermarried with James, on the 23rd day of December, 1868. He procured letters *de bonis non* to himself at the January term, 1869, resided upon the home place with his wife and her daughter, and continued, as administrator, the management and control of the estate, as he had virtually done before, as the counseller and attorney of the widow. No guardian of the infant was then appointed.

His wife died on the 16th of July, 1872, and he was very soon afterwards appointed guardian of the heir. No administration was ever had of the wife's estate.

At the following January term he presented to the Probate Court a petition showing that when he became administrator, in 1869, the estate was largely in debt; that the only available property consisted in the plantation; that to have sold the property would have resulted in insolvency of the estate, or that it was considered probable; that inasmuch as his wife had owned the

estate. and her children were the only heirs, the Court
had ordered him to keep the property together and cul-
tivate it and try to pay off the debts, he having agreed
to use his own means for the purpose, and having
actually done so to the extent of twelve or fifteen thou-
sand dollars. He then asked inasmuch as he had his
own stock on the place, that he be allowed to keep and
cultivate the plantation, charging himself with a rent of
$3000 for the year 1873, which was represented as a fair
valuation, deducting costs of usual repairs. He promised
in his petition to file a settlement showing the estate
largely indebted to him; represented that it was indebt-
ed to himself alone, as he had paid off all the claims,
partly with assets of the estate, and partly with his
private means; and that after the first year he could rent
the place at public auction.

The petition was granted on condition that no allow-
ance would be made for repairs, and that the plantation
should be returned in as good condition, usual wear and
tear excepted.

Accordingly on the 5th day of June, 1873, he filed the
promised settlement, which was the first ever made,
bringing it down to the 1st of April, 1873. It is out of
this settlement that all the important matters in contro-
versy in this case arise. He accompanied it with an ex-
planation attached, showing that inasmuch as no sale of
the personal property had ever been made, the estate
having been kept and managed under the general order
of the Court, and inasmuch as a great deal of the property
which had been appraised, at high prices, was dead, and
no settlement had been made by the former administra-
trix, he had adopted the mode of settlement offered, by
charging himself with two-thirds of the appraisment
filed by the widow, allowing one third for her dower,

and charging himself with interest, and upon each item of assets, and crediting himself with interest on payments, both at the rate of six per cent.

He reported further that he had found the estate insolvent, the plantation out of repair and in bad condition; and the heir being the child of his wife, he had undertaken to repair it and pay it out of debt; that for six years he had advanced all of his private means for the purpose, even selling his real estate, and that the money for which he only charged 6 per cent., was worth to him 15. He did that, "being perfectly willing," as he says, "to make a fair settlement, and giving the estate all the benefit of the difference of interest."

Reserving further comment on this settlement, the errors of which it is claimed, run through and effect the subsequent ones, it is sufficient for the rest to say : that he failed to file any settlement in 1874 ; but did file annual settlements each April, afterwards in the years 1875, 1876 and 1877, which, with the first were all duly confirmed without exceptions. Each settlement begins with a balance of credits shown by the former, making a new rest for interests, and thus there appears in the last a balance of $15, 424.60, to the credit of the administrator. At the same time with the filing of the last settlement he presented another petition to the Probate Court, showing this indebtedness of the estate to himself, and how it had been incurred, that the clear income of the lands was about $3,000 ; that the minor was now a young lady of 15 years, and required to be sent off to school and educated and maintained in a style suited to her condition in life, which would require $1,000 per annum ; and that it would require many years to pay off the indebtedness. Further, that she was indebted to him as her guardian, for advances, and that the estate

owned a large quantity of lands worth about $40,000, much of which was unimproved and burdened with a heavy annual tax. He asks an order to sell so much of said lands as might be necessary to pay the debt, reserving the plantation and selling only unimproved lands and the Greenfield place. The petition was granted, in accordance with the prayer, and an order made, designating the lands to be sold.

At this stage of the proceedings the heir became dissatisfied. R. W. Trimble was appointed her guardian on the 23d day of July, 1877, and soon afterwards filed this bill in her behalf, charging fraud in the management of the estate, and in the settlements; alleging that in truth James was indebted to it; and seeking to re-open the settlements and re-state the accounts. During the proceedings the defendant James died and the complainant married. The husband D. L. Trimble joined as party complainant, and the suit was revived against Neel, who became at the same time administrator of both estates, that is of James and of Dorris.

The bill was answered at length, denying, or explaining the several specifications as to fraud; and insisting that the administration of James, although confessedly irregular, had been in good faith directed to the true interests of the minor; that the administrator had made it his primary object to protect the estate and save it for her, which he had done at great personal sacrifice. That a large amount of the charges against him had been assumed, in the settlement, out of generosity, and with a desire thereby to reach a result, which, *on the whole*, might be equitable, disregarding legal technicalities, which had been disregarded throughout; that the sole heir being the daughter of his wife, he had rather regarded her interests than the rules of law, and had in fact so

Trimble and Wife v. James, Ad'r.

managed as to save her a large estate, which otherwise would have proved insolvent. He submits that his settlements are just and liberal, but if not, and if he be held to a strict legal settlement, he submits that he be allowed those charges which he was not legally bound to have assumed, but which he did assume in settlement, to make it liberal, just and equitable in the result.

The cause was heard upon the pleadings, exhibits and a great mass of testimony as to details and specific items, involved in the controversy. The Chancellor upon the whole case found for the defendant, and deeming there was no equity in the relief sought, dismissed the suit. Trimble and wife appealed.

The principles which should govern Courts of Chancery in interfering with the proceedings and adjudications of the Courts of Probate in the administration of estates, have been announced upon several occasions, by this Court, since the adoption of the Constitution of 1874. See the cases of *Osborn et al v. Graham,* 30 *Ark.,* 66; *Reinhardt v. Gartrell,* 33 *Ib.,* 727; *Mock et al v. Pleasants,* 34 *Ib.,* 63; *Nathan v. Lehman et al,* 39 *Ib.,* 256.

When settlements have been duly confirmed, the orders of confirmation have the force and effect of judgments, which, if erroneous, may be corrected by appeal. But the original jurisdiction of the Probate Courts is exclusive, and no other Court, save in the course of appeal, can impeach or control their action for mere error. Courts of Chancery, however, may interfere to correct fraud, or relieve against accident, or upon some other ground of acknowledged equity jurisdiction, to prevent irremediable mischief. Such interference to extend only so far as to effect the object.

1. ADMINISTRATION: Proceedings in Probate Court, how corrected.

Trimble and Wife v. James, Ad'r.

Mere errors will not give jurisdiction, but actual or constructive fraud will. The question presented in this case is, has there been any fraud practiced by the administrator, by which the complainant has been so injured as to invoke the aid of a Court of Equity. Mere errors, unless sufficiently gross to raise the presumption of fraud, will not suffice. But fraud itself, whether actual or intended, or without base motive, practiced against the policy of the law; or in other words, constructive fraud, will suffice.

In general, the security of property and the peace of the community require, that, save in appellate proceedings, settlements should not be disturbed, where substantial justice has been done. Or even when it has not, when the errors have been legal or technical, untainted by actual fraud, and unaffected by practices however honestly intended, which the policy of the law will not permit. The Judges of Probate Courts are not required to be men learned in the law. As a general thing they, and administrators also, are more apt to be distinguished for business common sense, and a rude sense of justice and fair dealing between man and man, than for technical learning. In many cases, also, administration settlements partake largely of the nature of family adjustments. This is not proper, of course, and upon appeal the Probate Courts will be held to a strict pursuance of the law. But when not so corrected, if they remain liable to attack, and readjustment afterwards, when time may have obliterated the memory of details, and witnesses may be dead, and documentary evidence and private memoranda may be lost, no man, not an accurate lawyer, could, with safety to himself, undertake the settlement of an important estate.

The bill makes thirty-eight specifications of fraud in the first settlement, which, by the answer, are denied, explained or justified. Of these it is enough now to say that a

Trimble and Wife v. James, Ad'r.

great number of them are sustained by the proof, or admitted as matters of fact, in the answer. They are mostly of this nature. During the administration of Mrs. Dorris, and afterwards, during his own, James, acting in behalf of the representative of the estate, compromised, or bought in for less than their probated amount, a great many large claims against it, which he afterwards charged in his settlement of 1873 at their full value at six per cent.; thus showing a large balance in his favor. His counsel contend here, that in doing this he only exercised the right to invest his own money as any other business man might have done, and that no fraud was intended, but rather a benefit to the estate, the liabilities of which were not thereby increased. But on the other hand the estate gained time, by which a sale was prevented, and it was saved from insolvency. Of this intention and of this effect, there is no reason to doubt. Under the circumstances disclosed by the transcript we would be loth to say that there was on his part, any motive to commit a breach of confidence, or avaracious desire to enrich himself at the expense of his step-daughter. We are not sure that he has done so even if his settlement be allowed; because he raised the funds by borrowing at ruinous rates of interest, and by sales of his property. There is also a moral certainty, that the estate would not have paid these debts in full, if the strict course of law had been pursued, which the creditors might have compelled; in which case the heir would have been impoverished, instead of having yet a handsome estate, with a liberal income.

Conceding all this, the transactions were such as from public policy, the Courts of Equity can never allow, but must sternly regard as constructive fraud, and correct whenever properly appealed to for the purpose—regard-

2. **Administrator or his attorney can not speculate on the estate.**

less of motive. As the adviser of Mrs. Dorris whilst administratrix, and as administrator d. b. n. after his appointment, he stood in a fiduciary relation to the estate to save as much of it as possible, to make a speedy settlement, and to pay the claims as far as practicable—to the last cent if possible, and to save the heir what the creditors might abate. This was in the line of the duty he had assumed. The line of his interest in speculating upon the claims was to prolong the settlements, depreciate the claims, harrass the creditors by delays and impediments, and when paid, to deprive the heir of all advantage in the discounts. No one can be allowed to assume a position in which his interests are antogonistic to his duties, and derive a personal benefit from it. However firm the virtue of individuals may be, human nature as a general rule cannot endure the test, and equity, for security, removes the temptation by the inflexible rule, that all profits of the trustee, saving, perhaps, reasonable compensation, must enure to the benefit of the *cestuisque trustent.* The heir has the right to the correction of all such items, upon such terms as the Court may deem equitable.

3. Widow-Administratrix and her husband's liability for rents. Many of the specifications are not fraudulent in themselves, nor are the others which would be, fully sustained in every instance. The administrator in the first settlement assumes the burden of incorporating his wife's administration with his own, and begins by charging himself with two-thirds of the value of the appraisement, upon the erroneous footing of the total. He charged himself further with two-thirds of the Dorris note, and of the rents of the Hardwick place for the years from 1867 to 1872 inclusive, upon the estimate of $3000 a year (being $2000); and with two-thirds of the rents of the Greenfield place for the years '71 and '72 upon an esti-

mated rental value of $500 a year (being $666.66). It is charged that this was fraudulent, as, assuming his wife's liability, he should have charged himself with the whole of the appraisement, and the whole rents, at a higher value, not only during his own administration, but hers also.

There was certainly no fraud in this. Even if the administratrix had been accountable for any rent, or James had been so accountable, as the husband of the widow, after her marriage, it would not have been for more than two-thirds of the value, as to any of the lands; her dower having never been assigned. *Gantt's Dig.,, Sec.* 66; 8 *Ark., p.* 9. But really with regard to the Hardwick place, including the mansion house and lands attached, the widow had never been liable for any rents whatever. (*Gantt's Dig., Sec.* 2227 and 8 *Ark., supra*). It is not the duty of the widow to demand her dower until she may choose to claim it. She may rest in possession of the mansion and farm attached, free of rent, and enjoy one-third of the rents of other lands until those interested in having her confined to a more specific claim, may take steps to have her dower assigned. This is, primarily, the duty of the heir, or the guardian, if the heir be a minor. *Gantt's Dig., sections* 2239–40–41. James did not become the guardian of the heir until after the death of the wife.

This right of the wife, although likened to the common law quarantine, is not derived from it. It is created by statute and governed by its terms. There is nothing to indicate an intention that it shall exist *durante viduitate* alone. It exists " until her dower shall be laid off and assigned," and there is no more reason for contending that it shall cease with marriage than that her dower shall. With regard to the personal property and

choses · also, the widow's right to a third was unquestionable, and passed to her husband on marriage. By the law as it then existed, the whole of the choses in action were subject to debts. But the estate has proved to be solvent at last, and the claim is made here against the estate of James, not by a creditor, but the heir.

So far from any fraud appearing in the charges made against himself as to this personalty and rents, the surprising thing, upon any theory of bad faith in James, is that he made any charge against himself at all for the rents of the Hardwick place for the years from 1867 to 1872, inclusive. They involve many thousands of dollars, and he would not have been liable for a dollar of the amount on strict settlement. After the death of his wife, in July, 1872, neither place had any rental value for the remainder of the year. After 1872 he was properly chargeable with full rents on both places.

The estimated values of the rents, contained in this and subsequent settlements, seem at first view rather low as compared with the evidence, but they are not without evidence to support them; and taken in connection with the deliberate judgment of the Court in fixing the rent for one of the years, by a special order, at the same amount, and considering that the burden of repairs was assumed, we do not feel inclined to disturb them.

4. Administrator entitled to his advances and simple interest. The charges of fraud made as to the subsequent settlements, regard interest on the balances, which are calculated upon the face or probated value of the claims, and compounded at each settlement. This was, of course, wrong, and must be corrected equitably. The administrator is entitled only to actual advances, with simple interest at six per cent. till repayment, without

Trimble and Wife v. James, Ad'r.

intervening rests. The charges as to low rentals are repeated for the subsequent years.

We are unable to believe, notwithstanding the egregrious errors of those settlements and the irregular management of the whole administration, from beginning to end, that any fraudulent design was ever entertained by James of injuring his step-daughter; and it is yet a matter of very grave doubt whether, upon the whole, she has not been saved from poverty by his mistaken proceedings. Certainly his actions have not been those of a crafty, avaricious man, endeavoring to swallow up the estate; for if he meant that he would not have unnecessarily burdened himself with such enormous charges. He says they were gratuities, and they were doubtless made to cover any improper credits per contra, so as to make what he believed to be a fair and equitable adjustment between the estate and himself.

Although his credits are in law fraudulent, and must be so held; yet there would, in the absence of actual fraud, be no equitable ground of relief, unless there had been injury also. Besides, Courts of Equity can always mould the relief they extend, and impose equitable terms for its exercise. <span>5. Fraud of Administrator without injury no ground of relief.</span>

Whoever asks equity must do equity. It would be as unjust to allow the heir to avail herself of these gratuitous charges intended for equalization, and exact a strict settlement in all other respects, as it would be to allow the administrator to claim his excessive credits, even if he had only charged himself with what he legally should. <span>6. Erroneous charges against administrator corrected.</span>

His honor, the Chancellor, was, on the whole case, of the opinion that no equity had been made out. We cannot determine whether or not the complainant was entitled to relief until we find how the balance would <span>7. CHANCERY PRACTICE: When cross-bill not necessary.</span>

stand upon correction of errors on both sides. If such a statement should show no material diminution of the balance charged on the last settlement against the estate, it would appear that there had been no injury, otherwise the decree should be reversed. For this purpose a cross-bill is not necessary. Where the defendant seeks no positive relief against the complainant, but only to annull the equities he claims, or to modify the relief, seeking nothing beyond the dismissal of the bill, it may be made by way of defense.

Let there be a reference to the Clerk and Master to state an account upon the principles herein announced, and with the following directions; using for the purpose the pleadings, exhibits and proof contained in the transcript, and bringing it down to the same period with that of the last settlement confirmed by the Probate Court.

### DIRECTIONS ON REFERENCE.

Charge the administrator with two-thirds of the true footing of the appraisement bill, and of the Dorris note of the date of filing the same by his wife, the first administratrix.

Also with two-thirds of the value of the rents of the Greenfield place each year from the year 1867 to 1872, inclusive, estimating the values of the rentals for 1871 and 1872 as fixed by the settlement of 1873, and including all the years as above, during which said place was actually occupied, or should have been rented by the administrator, and in which the rents were of value. Charging no rents at all for the Hardwick place before the year 1873.

Also charging full rents on both places from 1873 onwards, adopting the values found by the Probate Court.

Also all other items than those above mentioned, charged by the administrator against himself.

Trimble and Wife v. James, Ad'r.

Let all bear interest from the date of receipt, the rent at the end of each year at six per cent. without rests until the period of balance.

### AND GIVE CREDIT:

For all sums of money, or value of property, actually paid out by the administrator for the benefit of the estate, or upon probated claims, regardless of the face value of the allowances. If any claims have been settled by the use of means of the estate *not charged* in the inventory and appraisement, give credit only for the balance. This is specially directed to the note of Wilkins & Bro. In determining these payments examine the testimony as to the specified items of excess, and with regard to credits not questioned, use the items and amounts contained in the confirmed reports.

Allow interest on all payments or just credits at six per cent. without rests, and strike a balance, showing the state of the account, whether for or against the estate, and the difference in the result from that reached by the Probate Court.

With regard to all matters which may arise in stating said account, concerning which no specific directions are here given, the clerk will be governed by the principles announced in this opinion, and conform the settlement to them as near as may be. Commissions to be allowed according to the statute.

Until the coming in of said account all other matters will be reserved.

On the coming in of the Master's report, the following *final opinion* was delivered :

EAKIN, J. Upon the filing of the Master's report in this case, exceptions thereto have been filed by the appellants. They also petition the Court for a reconsideration of some of the directions given upon reference, resulting from the

first opinion. This has been done after the usual time for filing motions for reconsideration, but as it has been done during the same term, and as the former opinion was given with a view to an interlocutory order of reference, the petition may very properly be considered.

Before doing that, however, or taking up the exceptions, it may properly be remarked that we are not now engaged in settling the account of James with the estate, with any view to a money decree in his favor for any definite amount, nor with a view of charging him if it should be found that he is indebted. The Court has not directed his accounts to be surcharged and falsified, or reformed from the beginning. The simple question to be first determined is: Did the Court below err in dismissing the bill? This Court had recognized much in the settlements which was fraudulent in law, but was further of the impression that there was no actual *mala fides,* and also that the administrator had, with a view to making a settlement, which on the whole might be just, charged himself with much that he need not have done. It became important to ascertain whether or not the heir had been injured by the mode of settlement adopted, in order that the action of the Court below might be tested by that consideration. This Court upon its own motion and for its own enlightenment, brought the services of the Master to aid it in details, not to base a decree upon his findings as if a reformation, or surcharging and falsifying of the accounts had been ordered, but to be better enabled to determine whether injustice had been done, by comparing the settlements as made, with such as ought to be made if the accounts were re-opened. The Court might have done this of itself and rendered a decree at once, but the labor would have been long, and mostly of a clerical character. It was simply a scheme adopted by this Court, in the exercise of its equity powers, to attain most readily the ends of substantial

Trimble and Wife v. James, Ad'r.

justice, in view of the peculiar circumstances of the case. The question, suspended for the report, now recurs again. Was the decree below, on the whole case, inequitable? If so, it must be reversed and the cause remanded for a restatement and reformation of the accounts in the Chancery Court, that the result may be made the basis of a final decree there, or certified to the Probate Court for further proceedings. If on the other hand, it be not, upon the whole, inequitable, then as heretofore intimated, this Court will sustain the Court below in declining to interfere with settlements originally made in the proper exclusive forum, and there confirmed without appeal, when no substantial injury has been done.

We are asked to reconsider so much of the former opinion as holds that the widow of Dorris was not bound to account to the estate for the rents of the home plantation whilst her dower had not been assigned. We think this has been well settled in this State by statute and decisions. *Gantt's Digest, Sec.* 2227; *Carnal v. Wilson,* 21 *Ark.,* 62; *Mock, et al. v. Pleasants,* 34 *Ark.,* 63. The last case is specially in point. A widow administratrix was charged with fraud in not accounting for the rents and profits of a plantation, before her dower was assigned. This Court said she was under no obligation to do so. "They *belonged to her,* as widow, and not as administratrix. If the plaintiffs desired to have any part of them applied toward payment of the debts, they should have adopted the proper means to have had her dower assigned to her." Such have been the decisions of other States under similar statutes; cited in *Carnal v. Wilson, supra; Ita lex scripta est.* With regard to the justice or policy of the law, or its hardship to heirs we have nothing to do. These are considerations for the legislature. The rights of the children in the devolution of the property of deceased parents depend wholly on that body. We would

be much at a loss in fixing a period at which the right of the widow should cease, short of her assignment of dower.

If the widow was not bound to account for these rents and profits during life, then her husband was not, in settling her accounts as administratrix, or his own as administrator. Nor does it alter the case that if accumulated in her hands they would have passed to her child as distributee. It is not the administrator of her estate that is sought here to be charged, but the administrator of the estate of Dorris, to which estate they never belonged. We adhere to the opinion that upon a strict settlement the administrator should not have been charged with these rents.

It is respectfully submitted, also, that this Court erred in permitting James to take credits for payments made by Mrs. Dorris during her administration. Nothing has yet been definitely permitted, but we have thought it reasonable in making such enquiries as may enable us to see the substantial justice of the case, to consider how far the charge made against James for assets received by his wife as administratrix, might be abated by proper application of that fund, made by her before it came to his hands.

Passing to the exceptions to the Master's report we notice such of them as do not depend on the modifications of the opinion as requested.

It is urged that the Master erred in crediting James with the taxes upon the property of the estate, during the years 1867 to 1872, inclusive, whilst the widow was in possession of the rents and profits. There are no special directions as to this in the opinion. It was not brought in any manner to the notice of the Court. The report is in accordance with the general directions, but if there be a mistake in this item it is just to consider it.

The general rule of law certainly is that pernancy of rents and profits is the criterion of the primary obligation to dis-

charge the taxes. Perhaps this modern statutory quarantine
of the widow may present an exceptional case. The right,
as is well said by counsel, is altogether a peculiar one, and
must be considered in its peculiar aspect. It is not an estate
in land with any certain duration. The property belongs to
the heirs, subject to the payment of debts, and either the
heirs or the administrator may by proper proceedings de-
termine it at once, and supplant it with dower. It may not
last a year and certainly cannot be apportioned. The ad-
ministrator or heir may properly pay the taxes in such case.
I have never known a case in which they have been disal-
lowed as credits, nor have I ever before known the question
to be raised  Does it alter the case, if the widow's occupa-
tion is protracted? If so, how long? When does the obli-
gation to pay taxes begin? We confess that it seems to us a
grave thing to disregard the otherwise universal rule as to
pernancy of profits, but its application to the case of the
widow's occupancy is attended with embarrassments quite as
grave, inasmuch as it may go far to encumber a benefit
which the legislature intended she should enjoy without any
conditions. It must always be remembered that the disposi-
tion of the property of decedents is wholly under legislative
control, and it has indicated no intention to impose this bur-
den on the widow as the price of her privilege. We prefer
to waive this question until we ascertain whether its deter-
mination can affect the case. For the present we only re-
mark that the taxes were paid on the whole estate, which
consisted largely of property not occupied by the widow, and
we have not the *data* for their apportionment.

It is excepted that the Master allowed James too great a
credit on a certain claim alleged to have been settled with
Bowe, Russell & Co., and which he had been allowed in the
Probate Court. The Master made his estimate upon a note
for $2519.00, and allowed in his credits interest from due,

at the rate of 10 per cent. It appears from a transcript, made Exhibit "G" of the complaint, that the note had in margin the figures $2519, but in the body the words "two thousand and nineteen dollars." Preceding that is another allowance to the same parties on an open account of $219.95 The note, as to interest, reads, "with interest at 10 per cent. per annum for value received." Immediately following the copy of the note, and a memorandum of its allowance by the administratrix, is the affidavit of one of the firm, that "the sum of two thousand five hundred and nineteen dollars, the within demand is justly due." This is followed by a memorandum of its allowance by the Judge, and its classification in the 4th class. The full entry of the Probate judgment is not given in the transcript. It is contended that the words in the body of the note should govern, and that interest after maturity should have been only 6 per cent. We recognize the rule that words in the body of an instrument should, in the absence of proof of misprision, govern figures in the margin, but we are satisfied from the transcript, or at least think there is reason to believe, that the body of the original note agreed with the figures, and that the clerk in transcribing omitted the words "five hundred." He had just entered the allowance for 219 dollars, and the similarity of numbers might have led him into an inadvertent error. The mind unconsciously tends to repetitions of formula. The true amount also appears in the affidavit which supports the figures, and leads to the supposition that there was no discrepancy between the figures and the body of the original note. Such an affidavit could not have been made if the body of the note were as transcribed. Again, if the judgment of allowance had been for the smaller amount it would have been in the interest of the complainants to show that by a transcript.

An effort has been made to clear this point by a *certiorari*

to the Circuit Clerk to send up the judgment of the Probate Court, and a correct copy of the original note, "issued as evidence" in this case—suggesting the absence of them as diminution. The Clerk of the Circuit Court responds that he sends herewith "a full, true and complete transcript of the diminution suggested," and attaches thereto a copy of the proceedings of the Probate Court certified by its Clerk. We may take this as indicating that the transcript from the Probate Court was used as evidence in the Chancery Court in this cause. Probably the original record of the Probate Court was used as evidence on the hearing, and this mode is now adopted of importing it into the record of this cause. This is mere conjecture, however, and we are not prepared to sanction the practice. If we could look at it, it would appear that the body of the note conformed with the figures and that the judgment followed it. We prefer, however, to discard it. The transcript should have been made and *filed in this case* below, to make it part of this record. We are reasonably well satisfied from the original transcript that the omission was a misprision. When the judgment was rendered it had not been decided that a note bearing more than statutory interest bore only 6 per cent after maturity unless the conventional interest be expressed to run after maturity.

It was very doubtful on principle when the judgment was rendered or when the note was paid. It would not do at this late day to deprive an administrator of a credit for a payment made in good faith, with ten per cent., continuing after maturity, by virtue of a subsequent decision of this Court in another case. Such action, carried out in all cases, would be very disasterous in its consequences.

Upon consideration of its exceptions, we think the report subserves the purpose for which it was directed, and sufficiently advises us of the true equities of the case. It shows a credit in favor of James of $18,795, being $3,371 in ex-

cess of the amount allowed him by the Probate Court. Even were we to make deductions from his credits, as given by the Master, of the excess claimed to have been allowed him improperly on the note of Bowe, Russell & Co., and also of the taxes paid on the home place during the widow's occupancy, by any reasonable apportionment on such data as we have, it would not materially diminish the allowance by the Probate Court.

We think, upon the whole case, that the Court below did not err in dismissing a case which, if prosecuted to the end, would have led to no results beneficial to the complainants. Upon the other hand there were things done by the administrator which courts of equity cannot sanction, whatever may have been his intent. Public policy requires their condemnation and discouragement. They invited litigation, and a long and expensive litigation has been necessary to disclose the fact that it should be fruitless. The complainants ought not to bear the burden of this. The whole costs of the Court below, and of this Court, including the Master's report, should be imposed upon James. We think it a mistake in the Court below not to have done that as a matter of manifest equity.

### DIRECTIONS FOR FINAL DECREE.

Modify the decree of the Jefferson Circuit Court in Chancery so as to impose the whole costs of that Court upon the estate of James, and let it be in other respects affirmed. Let the whole costs of this Court be decreed against the same party, including an allowance to the Master, which the Court here fixes at the sum of two hundred and fifty dollars, as reasonable.

SMITH, J., differed from the majority of the Court as to the principles upon which the administrator's account should be restated, and took no part in the subsequent proceedings, but has filed no dissenting opinon.